# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **RODNEY G. SMITH, EXECUTIVE** ) | |
| **DIRECTOR of the TEAMSTERS UNION** ) | |
| **25 HEALTH SERVICES & INSURANCE** ) | |
| **PLAN,** ) | |
| **Plaintiff,** ) | **Civil Action No. 04-12561-GAO** |
| ) | |
| **v.** ) | |
| ) | |
| **AIRBORNE EXPRESS, INC.** ) | |
| **Defendant.** ) | |

## FIRST AMENDED COMPLAINT

### Introductory Statement

1.  This is an action by the administrator of Teamsters Union 25 Health Services & Insurance Plan (hereinafter, "the Plan") for the collection of delinquent contributions.

### Jurisdiction and Venue

2.  Plaintiff invokes the jurisdiction of this Court pursuant to Section 502 (e)(1) of the Employee Retirement Income Security Act (hereinafter, "ERISA"), as amended, 29 U.S.C. § 1132(e)(1), which grants the district courts of the United States exclusive jurisdiction of civil actions brought to enforce the terms of an employee benefit plan and/or the provisions of ERISA, which confers a cause of action upon employee benefit plans for the collection of unpaid contributions due to such plans.

3.  Venue is appropriate in this Court under Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), which provides that an action may be brought in the district where the relevant employee welfare benefit plan is administered. and pursuant to 28 U.S.C. §1391(a), because Plaintiff's claims arose in this District.

## Parties

4.      Rodney G. Smith (hereinafter, "the Plaintiff") is the Executive Director of the Plan and a "fiduciary" within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002 (21) and he is authorized to bring this action on behalf of the Plan.  The Plan is a "multi-employer plan" as that term is defined in Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A), and is an "employee benefit plan" or "plan" as that term is defined in Section 3(3) of ERISA, 29 U.S.C. § 1002(3).  The Plan is administered by Trustees and exists for the exclusive purpose of providing health, medical and related benefits to its participants and beneficiaries.  The Plan has its principal office and is administered from 16 Sever Street, Charlestown, Massachusetts.

5.      Airborne Express, Inc. (hereinafter, "the Defendant" or "Airborne Express") is a foreign corporation having a usual place of business at 1200 South Pine Island Road, Plantation, Florida.

## Allegations of Fact

6.      The Plan is established and exists by virtue of an Agreement and Declaration of Trust whose terms require a participating employer to make contributions in accordance with the terms of the employer's collective bargaining agreement(s) with Teamsters Local Union No. 25.

7.      The Defendant is a participating employer having entered into a collective bargaining agreement with Teamsters Local Union No. 25 covering the periods from 1998 through 2003.  A true copy of the collective bargaining agreement between the Defendant and Teamsters Local Union No. 25 is attached hereto as Exhibit A.

8.      Pursuant to the terms of its collective bargaining agreement(s) with Local 25, the Defendant was obligated to make monthly contributions at stated hourly rates for each hour, up to forty (40) in a week, that its employees received or were due pay under the collective bargaining agreement.

9.      The collective bargaining agreement requires that the Defendant make health and welfare contributions for employees that are absent from work due to illness or injury.

10.     Pursuant to Article 44 of the collective bargaining agreement, the Defendant is obligated to make the required contributions of 32 hours per week for a period of not more than twelve (12) months for employees absent from work due to a work-related injury.

11.     Michael Connors (hereinafter "Mr. Connors") is an employee of the Defendant, who suffered a job-related injury on May 20, 2003, and was absent from work as a result thereof from May 21, 2003 through January 2, 2004.

12.     The Defendant made contributions of 32 hours for a period of eleven (11) weeks on behalf of Mr. Connors following Mr. Connors' injury, but has failed and refused to make contributions for the duration of Mr. Connors' injury-related absence, specifically for the period from August 15, 2003 through January 4, 2004.

13.     The amount of contributions owed the Plan by the Defendant on behalf of Mr. Connors is approximately $3,670.80.  By failing to make the required contributions, the Defendant has violated the terms of the Plan, and ERISA § 515.

## COUNT I

### (Enforcement of 29 U.S.C. §1145)

14.    Plaintiff reavers every allegation contained in paragraphs 1 through 13 herein.

15.    Plaintiff is entitled to recover Defendant's unpaid and delinquent contributions plus interest, liquidated damages, and attorney's fees and costs pursuant to 29 U.S.C. §§1132 and 1145.

## COUNT II

### (Enforcement of the Plan's Terms)

16.    Plaintiff reavers every allegation contained in paragraphs 1 through 15 herein.

17.    Defendant has violated the terms of the Plan by failing to make contributions to the Plan on behalf of Mr. Connors for the period between August 15, 2004 and January 4, 2004.

18.    Plaintiff is entitled to enforcement of the Plan's terms pursuant to 29 U.S.C. §1132(a)(3).

### Prayers for Relief

WHEREFORE, the Plaintiff prays that judgment enter for the following, all as provided for by Section 502(g)(2) of ERISA, 29 U.S.C. §132(g)(2):

(1)    The delinquent contributions;

(2)    Interest on the delinquent contributions:

(3)    Liquidated damages in the amount of 20% of the delinquent contributions;

(4)    Reasonable attorney's fees and costs of this action; and

(5)    Such other legal or equitable relief as deemed appropriate by this Court.

4

For the Plaintiff,
**RODNEY G. SMITH,**
**EXECUTIVE DIRECTOR of the**
**TEAMSTERS UNION 25 HEALTH**
**SERVICES AND INSURANCE PLAN,**
By his attorney,


_/s/ Kathleen A. Pennini_____
Matthew E. Dwyer
BBO# 139840
Kathleen A. Pennini
BBO # 654573
Dwyer, Duddy and Facklam, P.C.
One Center Plaza, Suite 360
Boston, MA 02108-1804
(617) 723-9777

Dated: March 3, 2005
f:\l25hsip\dhl airborne connors\pldg\amended.complaint.doc:blg

AGREEMENT

Between

AIRBORNE FREIGHT CORPORATION

OFFICE CLERICAL

and

TEAMSTERS LOCAL 25

April 1, 1998

to

March 31, 2003

AGREEMENT
AIRBORNE FREIGHT CORPORATION
IBT LOCAL 25

## TABLE OF CONTENTS

| | PAGE |
|---|---|
| ARTICLE 10 ABSENCE | 4 |
| ARTICLE 25 ACCESS TO PREMISES | 14 |
| ARTICLE 48 ALCOHOL AND DRUG TESTING | 26 |
| ARTICLE 20 BONDS | 13 |
| ARTICLE 46 BREAKS | 26 |
| ARTICLE 53 CASUAL GRIEVANCES | 26 |
| ARTICLE 50 CHANGE OF OPERATIONS | 33 |
| ARTICLE 7 CHECK-OFF | 3 |
| ARTICLE 29 CREDIT UNION | 15 |
| ARTICLE 26 DEATH IN FAMILY | 14 |
| ARTICLE 14 DISCHARGE & SUSPENSION | 14 |
| ARTICLE 51 DURATION | 33 |
| ARTICLE 52 EMPLOYEE HARASSMENT | 33 |
| ARTICLE 41 EMPLOYEE'S BAIL | 20 |
| ARTICLE 1 EMPLOYEES COVERED | 1 |
| ARTICLE 21 EXAMINATIONS | 14 |
| ARTICLE 40 GARNISHMENTS | 20 |
| ARTICLE 12 GRIEVANCE MACHINERY COMMITTEE | 6 |
| ARTICLE 13 GRIEVANCE MACHINERY AND UNION LIABILITY | 7 |
| ARTICLE 44 HEALTH AND WELFARE | 21 |
| ARTICLE 15 HOLIDAYS | 10 |
| ARTICLE 23 INJURY ON THE JOB AND COMPENSATION | 14 |
| ARTICLE 27 JURY DUTY | 15 |
| ARTICLE 47 LIE DETECTOR | 26 |
| ARTICLE 24 LOSS OR DAMAGE | 14 |
| ARTICLE 4 MANAGEMENT RIGHTS | 2 |
| ARTICLE 31 MATERNITY LEAVE | 15 |
| ARTICLE 30 MEAL PERIOD | 15 |
| Family and Medical Leave | 16 |
| ARTICLE 34 MILITARY CLAUSE | 18 |
| ARTICLE 19 NEW POSITIONS - VACANCIES | 13 |
| ARTICLE 42 NONDISCRIMINATION | 20 |
| ARTICLE 32 PART-TIME EMPLOYEES | 17 |
| ARTICLE 49 PARTTIME TO FULLTIME HIRING RATIO POLICY | 26 |
| ARTICLE 45 PENSIONS | 23 |
| ARTICLE 22 PERSONAL IDENTIFICATION | 14 |
| ARTICLE 35 POSTING OF AGREEMENT | 19 |
| ARTICLE 3 PROTECTION OF RIGHTS | 1 |
| ARTICLE 11 SENIORITY AND PROMOTIONS | 4 |
| ARTICLE 39 SEPARABILITY AND SAVINGS CLAUSE | 19 |
| ARTICLE 38 SEPARATION OF EMPLOYMENT | 19 |
| ARTICLE 17 SICK LEAVE | 12 |
| ARTICLE 8 STEWARDS APPOINTMENTS & DUTIES | 3 |
| ARTICLE 9 SUB-CONTRACTING | 4 |
| ARTICLE 28 TRAINING | 15 |
| ARTICLE 5 TRANSFER OF COMPANY TITLE OR INTEREST | 2 |
| ARTICLE 33 UNIFORMS | 18 |
| ARTICLE 2 UNION RECOGNITION | 1 |
| ARTICLE 6 UNION SECURITY | 2 |
| ARTICLE 36 UNION AND EMPLOYER COOPERATION | 19 |
| ARTICLE 37 UNION ACTIVITIES | 19 |
| ARTICLE 16 VACATIONS | 11 |
| ARTICLE 43 WAGES | 20 |
| ARTICLE 18 WORK WEEK AND WORK DAY | 12 |

## AGREEMENT

For the period beginning April 1, 1998, and ending March 31, 2004, this Agreement is made and entered into by and between Airborne Freight Corporation, hereinafter referred to as "The Employer", and Local 25, Teamsters, Chauffeurs, Warehousemen and Helpers I.B.T. of 544 Main Street, Boston, Massachusetts, hereinafter referred to as the "Union".

## ARTICLE 1
### EMPLOYEES COVERED

Employees covered by this Agreement shall be construed to mean, and limited to, the Clerical Employees who are employed by the Employer at the Employer's place of business at Logan International Airport, Boston, Massachusetts, and any other terminal facility which the Employer may open within a fifty (50) mile radius thereof, who work in the following departments: International Department, Inbound Department, Outbound Department, Customer Service Department, Rating, Teletype Operator and OS and D. The company will maintain a master seniority list for purposes of lay-off/recall and an annual bid. Terminal seniority would apply in all other bid situations (e.g.) daily overtime, vacations, sick leave replacement, premium day work etc. An annual bid will be posted in December of each year in conjunction with the vacation bid to be effective in January and will be done from the master seniority list. Any new facility opening in the Local 25 jurisdiction will require clerical staffing. Assist in Driver Check-ins.

## ARTICLE 2
### UNION RECOGNITION

(A)    The Employer and the Union agree that the Union is the sole collective bargaining representative for the Employees covered by this Agreement.

(B)    The term "Employee" or "Employees" as used in the Agreement shall not be construed to extend to, or effect in any way Station Managers, Assistant Station Managers, Office Managers, Operations Managers, Salesmen, Supervisory Personnel, Executive Personnel, Confidential Employees, Sales Trainees and Management Trainees. This shall include all Employees within the meaning of the Labor-Management Relations Act of 1947, as amended.

## ARTICLE 3
### PROTECTION OF RIGHTS

(A)    Picket Lines - It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action nor shall such employee be permanently replaced in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line at the Employer's places of business.

(B)    It shall not be a violation of this Agreement and it shall not be cause for discharge or disciplinary action nor shall such employee be permanently replaced if any employee refuses to perform any service which his Employer undertakes to perform as an ally of an Employer or person whose employees are on strike, and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.

## ARTICLE 4
### MANAGEMENT RIGHTS

Except to the extent specifically abridged by a provision of the Agreement, the manage-
ment of the business of the Employer and of the work force, the staffing of the facili-
ties, the discharge and discipline of employees, the location, establishment and elimi-
nation of facilities, the services to be marketed, and the maintenance and development
of employee efficiency, and all other matters consistent with the economical and effi-
cient operation of the business, are vested solely in the Employer.

## ARTICLE 5
### TRANSFER OF COMPANY TITLE OR INTEREST

This Agreement and the Supplemental Agreements hereto, hereinafter referred to collec-
tively as "Agreement", shall be binding upon the parties hereto, their successors,
administrators, executors, and assigns. In the event an entire operation, or rights
only, are sold, leased, transferred or taken over by sale, transfer, lease, assignment,
receivership or bankruptcy proceedings, such operation or use of such rights shall con-
tinue to be subject to the terms and conditions of this Agreement for the life thereof.

On the sale, transfer or lease of an individual run or runs, or rights only, the
specific provisions of this Agreement, excluding riders or other conditions, shall pre-
vail.  It is understood by this Section that the parties hereto shall not use any leas-
ing device to a third party to evade this Agreement.  The Employer shall give notice of
the existence of this Agreement to any purchaser, transferee, leasee, assignee, etc. of
the operation covered by this Agreement or any part thereof.

Such notice shall be in writing with a copy to the Local Union, at the time the seller,
transferer, or lessor, executes a contract or transaction as herein described.  The
Local Union shall also be advised of the exact nature of the transaction, not including
financial details.  In the event the Employer fails to require the purchaser, trans-
feree, or leasee to assume the obligations of this Agreement, the Employer (including
partners thereof) shall be liable to the Local Union, and to the employees covered for
all damages sustained as a result of such failure to require assumption of the terms of
this Agreement, but shall not be liable after the purchaser, the transferee or lessee
has agreed to assume the obligation of this Agreement.

When a signator to this Agreement purchases rights from another signator, the purchaser
must accept the affected employees of the seller, in accordance with the provisions of
Article 6 before hiring any new employees.  The applicable lay-off provisions of this
Agreement shall apply.  When rights are sold to a non-signator to this Agreement, and
such purchaser is the sole bidder, the provisions of this Agreement shall not apply.
However, in the event of multiple bids, one or more of such bidders being signator to
this Agreement, and the seller elects to sell to a non-signator, then all of the provi-
sions of this Article shall apply.

## ARTICLE 6
### UNION SECURITY

(A)   All Employees presently employed upon completion of thirty (30) calendar days
employment from the effective date of employment, whichever is later, shall join the
Union and shall thereafter remain members of the Union as a condition of employment.

(B)   All new employees after thirty (30) calendar days employment from the date of
employment, shall join the Union and shall thereafter remain members of the Union as a
condition of employment.

(C)    Any employee who fails to maintain his membership to the extent of not paying uniform dues and initiation fees after such thirty (30) calendar day period, shall be discharged by the Employer immediately upon notification from the Union in writing.

ARTICLE 7
CHECK-OFF

(A)    The Employer agrees to deduct from the pay of all employees covered by this Agreement the dues, initiation fees and/or uniform assessments of the Local Union having jurisdiction over such employees and agrees to remit to said Local Union having jurisdiction over such employees and agrees to remit to said Local Union all such deductions taken from the 1st payroll period of each month and remit to the Local Union by the 2nd payroll period of each month. Where laws require written authorization by the employee, the same is to be furnished in the form required. No deduction shall be made which is prohibited by applicable law. Where an employee who is on check-off is not on the payroll during the week in which the deduction is to be made or has no earnings or insufficient earnings during that week or is on a leave of absence, the employee must make arrangements with the Local Union to pay such dues in advance.

(B)    The Employer will recognize authorization for deductions from wages, if in compliance with state law, to be transmitted to the Local Union or to such other organizations as the Union may request if mutually agreed to. No such authorization shall be recognized if in violation of state or federal law. No deductions shall be made which are prohibited by applicable law.

(C)    The Employer agrees to deduct from the paycheck of all employees covered by this Agreement voluntary contributions to DRIVE. DRIVE shall notify the Employer of the amounts designated by each contributing employee that are to be deducted from his/her paycheck on a weekly basis for all weeks worked. The phrase "weeks worked" excludes any week other than a week in which the employee earned a wage. The Employer shall transmit to DRIVE Chapter 25 on a monthly basis, in one check the total amount deducted along with the name of each employee on whose behalf a deduction is made, the employee's Social Security number and the amount deducted from the employee's paycheck.

ARTICLE 8
STEWARDS APPOINTMENTS & DUTIES

The Employer recognizes the right of the Union to designate Job Stewards and alternates for each terminal from the Employer's seniority list but no more than one in each classification. The authority of job stewards and alternates so designated by the Union shall be limited to, and shall not exceed the following duties and activities:

    (1)    The investigation and presentation of grievances to his Employer or the designated company representative in accordance with the provision of the collective bargaining agreement;

    (2)    The collection of dues when authorized by appropriate Local Union official;

    (3)    The transmission of such messages and information which shall originate with, and are authorized by the Local Union or its officers, provided such messages and information:

        (a)    have been reduced to writing, or

        (b)    if not reduced to writing, are of a routine nature, and do not involve work stoppages, slowdowns or refusals to handle goods.

5

(4)    Employees at their request may have their shop steward or alternate present at discussions with management which may lead to discipline or discharge of the employee.

Job stewards and alternates have no authority to take strike action, cause a slowdown or any other action interrupting the Employer's business, except as authorized by official action of the Union.  The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Union liable for any unauthorized acts.  The Employer in so recognizing such limitations shall have the authority to impose proper discipline including discharge, in the event the shop steward has taken unauthorized strike action, or work stoppage in violation of this Agreement.  The Union reserves the right to remove the Shop Steward at any time for the good of the Union.

Stewards shall be granted super-seniority for layoff purposes only.  Past practice in regard to rehire, bidding and job preference shall apply.

## ARTICLE 9
### SUB-CONTRACTING

For the purpose of preserving work and job opportunity for the employees covered by this Agreement, the Employer agrees that no work or services of the kind, nature or type covered by, presently performed or hereafter assigned to the collective bargaining unit shall be subcontracted, transferred, leased, assigned or conveyed in whole or in part to any other plant, person or non-unit employees.

## ARTICLE 10
### ABSENCE

(A)    The Employer agrees to grant the necessary and reasonable time off, without dis-crimination or loss of seniority rights and without pay, to any employee designated by the Union to attend a labor convention or serve in any capacity on other official Union business, provided forty-eight (48) hours' written notice is given to the Employer by the Union, specifying length of time off.  The Union agrees that, in making its request for time off for union activities, due consideration shall be given to the number of men affected in order that there shall be no disruption of the Employer's operations due to lack of available employees.

(B)    Any employee desiring leave of absence from his employment shall secure written permission from both the Local Union and Employer.  The maximum leave of absence shall be for thirty (30) days and may be extended for like periods.  Permission for extension must be secured from both the Local Union and Employer.  During the period of absence, the employee shall not engage in gainful employment.  Failure to comply with this pro-vision shall result in the complete loss of seniority rights for the employees involved.  Inability to work because of proven sickness or injury shall not result in the loss of seniority rights.

## ARTICLE 11
### SENIORITY AND PROMOTIONS

(A) Seniority for employees governed by this Agreement shall be defined as the period of employment with the Employer in the work covered by this Agreement at the terminal within the jurisdiction of the Local Union.  It shall be deemed to include any senior-ity presently held by an Employee through Agreement between the Employer and the Union prior to this Agreement.  It is expressly understood that part-timer seniority is

applicable only to part-time positions and full-time seniority is applicable only to full-time positions.

There shall be maintained separate seniority rosters for full-time and part-time employees. If an employee voluntarily elects to transfer from a full-time position to a part-time position, that employee's seniority date for the purpose of this Agreement shall be the date on which the employee transfers to the part-time position and the employee will be removed from the full-time roster and placed on the part-time roster.

(B)   All new employees shall be hired on a thirty (30) calendar days' trial basis and shall work under the provisions of this Agreement, within which they may be dismissed without protest by the Union. However, the Employer may not discharge or discipline for the purpose of evading this Agreement or discriminating against Union members. After thirty (30) days trial period they shall be placed on the seniority list as regular employees in accordance with their date of hire, provided, however, that an employee must work a minimum of ninety-six (96) hours during this thirty (30) days trial period.

(C) The parties hereto recognize and accept the principle of seniority in rehiring and laying off. Employees of a higher classification shall be given an opportunity to work in a lower classification in lieu of a layoff provided they are the Senior employees, and are capable of performing the work available. Seniority shall prevail in selection of starting times, in recall to work opportunity in the event of layoff for lack of work, in recall to work after layoff, in selection of vacations from the vacation schedule. Seniority does not give an employee the right to choose any specific assignment or department. In the event of a layoff, the layoff shall be conducted in the following order:

1) Part-time employees shall be terminated in inverse seniority order first;
2) If all part-time employees have been laid off, full-time employees in inverse seniority order shall be laid-off next.

(D)   No full-time position existing on the effective date of this agreement, may be laid off so long as any part-time employee is working. The company agrees to restore full-time status, those individuals currently working part-time with recall rights to full-time caused by the removal of customer service for the duration of the Agreement.

(E)   In the event the Employer lays off employees, it shall give three (3) working days notice to the affected employees. In the event that this is not possible, employees will receive notice or pay in lieu thereof of two (2) working days and will receive time and one-half compensation for all hours worked on the last working day prior to the layoff notice.

In the event an employee has been laid off, he shall be recalled by telephone or telegram or personal contact at the last address given to the Employer at least the night before he is to return to work except in the event of illness on that day.

Where work develops during the next day, the Employer shall, in the order of seniority of the laid-off men, make such work available by telephone or telegram or personally contacting the employee at his home or such place as shall have been designated with the supervisor as the place of contact. An employee recalled by the above procedure must notify the Employer as soon as possible in advance of the specified time for his report of his intention to report. In the event the employee fails to comply with the above provision, he shall have no claim for work opportunity lost until he reports, but the Employer shall be responsible for the work opportunity lost if he shall fail to comply with these provisions.

(F)   Seniority shall be broken only by:

    (1)   Discharge

    (2)   Voluntary quit

    (3)   Failure to respond to a notice of recall as specified in Article 11, paragraph (G) of this Agreement.

    (4)   Unauthorized leave of absence.

    (5)   Unauthorized failure to report for work for three (3) consecutive days when working and on seniority list.

    (6)   Voluntary transfer from a full-time position to a part-time position for reasons other than layoff in the manner prescribed in Article 11, paragraph (A)

(G)   When premium days outside the normal work week becomes available, such work shall be allocated to the workforce in the following manner:

    (1)   Such work to first be offered by terminal seniority, in order of seniority.

    (2)   In the event that the full-time employee(s) declines such work, then it shall be offered to the qualified part-time employee(s) in order of seniority.   If they decline it, then such work shall be assigned to such part-time employee(s) in reverse order of seniority.

    (3)   In the event that there is still work available, after the work has been assigned to the qualified part-time employee(s) hired after the effective date of this Agreement, according to part (2), then such work shall be assigned to the full-time workforce, in reverse order of seniority.

(H)   Any employee who is absent because of proven illness or injury shall maintain his seniority.

## ARTICLE 12
### GRIEVANCE MACHINERY COMMITTEE

Section 1.   The Operators and the Unions shall together create a permanent New England Joint Area Committee, hereinafter referred to as the Joint Area Committee, composed of the following Local Unions 25, 42, 49, 59, 170, 191, 251, 404, 437, 443, 493, 526, 653, 671 and 677.   The Joint Area Committee shall consist of an equal number appointed by Employers and Unions but no less than three (3) from each group.   Each member may appoint an alternate in his place.   The Joint Area Committee shall at its first meeting formulate rules of procedure to govern the conduct of its proceedings.   The Joint Area Committee shall have jurisdiction over disputes and grievances involving Local Unions or complaints by Local Unions participating in such Committee.   This Joint Area Committee shall meet at established times and at a mutually convenient location.

Section 2.   The Employers and the Unions shall together create a permanent Eastern Conference Joint Area Committee which shall consist of delegates from The Eastern Conference Area.   This Eastern Conference Joint Area Committee shall meet at established times and at a mutually convenient location.

Section 3.   If a dispute or grievance arising out of operations under this Agreement involves a Local Union situated in contiguous territory, such dispute or grievance

shall be referred to the Joint Area Committee for handling by the Executive Secretary of the New England Joint Area Committee, and after such reference shall be handled under the usual procedure of that joint committee.

Section 4.  Meetings of all Committees above-referred-to must be attended by each member of such Committee or his alternates.

Section 5.  The Local Union or the Joint Area Committee and Eastern Conference Joint Area Committee shall have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute.

## ARTICLE 13
### GRIEVANCE MACHINERY AND UNION LIABILITY

Section 1.  The Union and the Employers agree that there shall be no strike, lockout, tie-up, or legal proceedings without first using all possible means of a settlement, as provided for in this Agreement, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved, according to the following procedure:  An employee with a grievance (other than a discharge or suspension, cf. Article 14 infra) shall promptly notify the shop steward, who shall then conduct a meeting with an authorized representative of management, for the purpose of adjusting the same.  If the grievance  is not resolved through the meeting, then it shall be reduced to writing, and submitted personally to the District Operations Manager and Business Agent, who shall meet as soon as practicable to adjust the same. In the event that the grievance is not resolved through this meeting, then it shall be submitted to the appropriate committee, for further processing as described in the sections below.

In order to expedite the handling of grievances, it is agreed that the moving party (e.g. union) must file the grievance with the appropriate committee within thirty (30) calendar days, of the known occurrence giving rise to the grievance, and the non-moving party (e.g. employer) must respond in writing to the grievance within thirty (30) calendar days from the date that he was personally served with the written grievance. These time limits shall apply, without regard to whether the preliminary steps described above have all been exhausted up to that point, and the failure to file or answer within the stated periods shall be deemed a waiver of the failing party's position, unless the time limits have been extended by mutual agreement.

    (a)    Where the New England Joint Area Committee, by a majority vote, settles a dispute, no appeal may be taken to the Eastern Conference Joint Area Committee.  Such a decision will be final and binding on both parties.

    (b)    Where the New England Joint Area Committee is unable to agree or come to a decision on a case, it shall be submitted or appealed to the Eastern Conference Joint Area Committee at the next regular constituted session, at the request of the Employer or Union involved except as otherwise provided in (d) below.  Where the Eastern Conference Joint Area Committee, by a majority vote, settles a dispute, such decision shall be final and binding on both parties with no further appeal.  Minutes of the New England Joint Area Committee shall set forth the position and facts relied on by each party, but each party may supplement such minutes at the hearing before the Eastern Conference Joint Area Committee.

            Deadlocked cases may be submitted to umpire handling if a majority of the Eastern Conference Joint Area Committee determines to submit such matter to

an umpire for decision.  Otherwise either party shall be permitted all legal or economic recourse.

(c)  It is agreed that all matters pertaining to the interpretation of any provisions of this Agreement may be referred by the Area Secretary for the Union and/or the Area Secretary for the Employers at the request of either the Employers or the Union, parties to the issue, with notice to the other Secretary, to the New England Joint Area Committee at any time for final decision.  At the request of the Company or Union representative, the New England Joint Area Committee shall be convened on seventy-two (72) hours notice to handle matters so referred.

(d)  Deadlocked cases other than discharge cases may be submitted to umpire handling if a majority of the New England Joint Area Committee determines to submit such matter to an umpire for decision.  Before any strike or stoppage of work takes place over a grievance or interpretation arising out of this contract that cannot be settled in accordance with the grievance machinery as set out in this Agreement, there must be approved by the Director of the Eastern Conference of Teamsters or his designee with notice of such approval to be given to the Employer in writing.  The granting of such approval by the Director of the Eastern Conference of Teamsters or his designee shall not impose any liability on said Conference.  If a discharge case is deadlocked at the New England Joint Area level, it shall be submitted to an impartial umpire for handling.  The Joint Area Committee shall attempt to agree on such umpire.

If the Joint Area Committee cannot agree within ten (10) days after the deadlock, such umpire shall be selected from a panel of three submitted by the presiding judge of the Federal District Court.  Selection of the umpire shall be made by the alternate striking of names within seventy-two (72) hours after the names are submitted to the parties. Hearing shall be held within ten (10) days thereafter.  The decision of the umpire shall be final and binding.  The fees and costs of the umpire shall be divided equally between the Employer and the Union involved.

(e)  Failure of the Joint Committee to meet without fault of the complaining side, refusal of either party to submit to or appear at the grievance procedure at any stage, or failure to comply with any final decision withdraws the benefits of this Article.

(f)  In the event of strikes, work-stoppages or other activities which are permitted in case of deadlock, default, or failure to comply with majority decisions no interpretation of this Agreement by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strike unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement.  Nothing herein shall prevent legal proceedings by the Employer where the strike is in violation of this Agreement.

(g)  The procedures set forth herein may be invoked only by the authorized Union representative or the Employer.

Section 2.  It is further mutually agreed that the Local Union will, within two weeks of the date of the signing of this Agreement, serve upon the Company a written notice, which notice will list the Union's authorized representative who will deal with the Company, make commitments for the Union, generally and in particular have the sole authority to act for the Union in calling or instituting strikes or any stoppages of

work, and the Union shall not be liable for any activities unless so authorized. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout, or any unauthorized cessation of work in violation of this Agreement, the Union shall not be liable for damages resulting from such unauthorized acts of its members. While the Union shall undertake every reasonable means to induce such employees to return to their jobs during any such period of unauthorized stoppage of work mentioned above, it is specifically understood and agreed that the Company during the first twenty-four (24) hour period of such unauthorized work stoppage shall have the sole and complete right of reasonable discipline short of discharge, and such Union members shall not be entitled to or have any recourse to any other provisions of this Agreement.

After the first twenty-four (24) hour period of such stoppage and if such stoppage continues, however, the Company shall have the sole and complete right to immediately discharge any Union member participating in any unauthorized strike, slowdown, walkout, or any other cessation of work, and such Union members shall not be entitled to or have any recourse to any other provision of this Agreement. It is further agreed and understood that the Union shall not be liable for any strike, breach or default in violation of this Agreement unless the act is expressly authorized by its Executive Board. A properly designated officer of the Unions shall, within twenty-four (24) hours after request is made to the Executive Secretary of the Unions declare and advise the party making such request by telegram whether the Union has authorized any strike or stoppage of work. The Union shall make immediate effort to terminate any strike or stoppage of work which is not authorized by it without assuming liability therefore.

It is understood and agreed that failure of the Union to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

Section 3. Notwithstanding anything herein contained, it is agreed that in the event any Employer is delinquent at the end of a period in the payment of his contribution to the Health and Welfare or Pension Fund or Funds, created under this Agreement in accordance with the rules and regulations of the Trustees of such Funds, after the proper official of the Local Union has given seventy-two (72) hours' notice to the Employer of such delinquency in Health and Welfare or Pension payments, the employees or their representatives shall have the right to take such action as may be necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting therefrom.

Section 4. In the event that a fundamental question arises concerning the interpretation of this Agreement, as opposed to a routine grievance which would proceed through normal channels, the following ancillary procedure shall apply. The District Manager and Business Agent shall meet pursuant to the normal grievance steps and during such meeting shall jointly determine whether a fundamental question of interpretation exists. If they cannot agree that such a question exists, then the matter shall proceed through normal grievance channels, as outlined above. If, however, the District Manager and Business Agent agree that a fundamental question of interpretation exists, then they shall extend the time limits of the grievance procedure for an agreed to period, and jointly take the matter to the Interpretation Committee. Said Committee shall be comprised of an equal number of management and union representatives, each of whom was an actual party to the negotiation of this Agreement, and said Committee shall convene and decide the issue as soon as practicable. In the event that the Interpretation Committee is unable to resolve the question, by majority vote, within the time period agreed to between the District Manager and Business Agent, then it shall be filed with the New England Joint Area Grievance Committee within ten (10) days after the Interpretation Committee meeting, and processed according to the provisions thereof.

## ARTICLE 14
### DISCHARGE & SUSPENSION

The Employer shall not discharge nor suspend any employee without just cause but in respect to discharge or suspension shall give at least one (1) warning notice of the complaint against such employee, in writing, and a copy of the same to the Union affected, except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty, under the influence of alcohol or illegal drugs, recklessness resulting in serious accident while on duty, or the carrying of unauthorized passengers. The warning notice as herein provided shall not remain in effect for a period of more than nine (9) months from date of said warning notice. Discharge must be by proper written notice to the employee and the Union affected. Any employee may request an investigation as to his discharge or suspension. Should such investigation prove that an injustice has been done to an employee, he shall be reinstated. The New England Joint Area Committee shall have the authority to order full, partial or no compensation for lost time. Appeal from discharge, suspension or warning notice must be taken within ten (10) days by written notice, and a decision reached within thirty (30) days from the date of discharge, suspension or warning notice. If the employee involved is not within the home terminal area, when the action of discharge, suspension or warning notice is taken, the ten (10) day period will start from the date of his return to the home terminal. If no decision has been rendered on the appeal within thirty (30) days the case shall then be taken up as provided for in Article 13 of this Agreement.

Any employee discharged away from his home terminal shall be provided the fastest available transportation to his home terminal at the Employer's expense. Except in cases involving "cardinal" infractions under this Agreement, an employee to be discharged or suspended shall be allowed to remain in the job until the discharge or suspension is sustained under the grievance procedure.

## ARTICLE 15
### HOLIDAYS

(A)    The following shall be recognized as paid holidays and all full-time employees shall be paid eight (8) hours straight time pay and all regular part-time employees shall be paid four (4) straight time hours therefore: New Years Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Friday after Thanksgiving December 24 (Day before Christmas), and Christmas Day irrespective of the day on which the holiday falls and four (4) floating holidays, one which may be the employee's birthday or any other three days mutually agreed to.

(B)    Regular employees shall be paid for each recognized holiday, or the day celebrated as such, irrespective of what day of the week the holiday falls, on the basis of eight (8) hours at their straight time rate, provided they work any day during the payroll period. Any regular employee laid off for lack of work shall not be deprived of his holiday pay if the layoff does not exceed thirty days' duration. Regular employees required to work on any such days shall be paid the applicable premium rate in addition to the holiday pay.

In the case of the floating holiday it will be incumbent upon the employee to request such holiday from his employer at least seven (7) days prior to said holiday. All conditions in this Article relating to holidays shall apply to the floating holiday. An employee after electing the personal holiday or eight (8) hours pay in lieu of the holiday shall have no recourse. All unused floating holidays are to be paid off at the end of each contract year.

(C)    Employees on night work whose regular work begins on a holiday evening or ends on a holiday morning, shall be given either the night before or the night after off, for their holiday in accordance with the Work Schedule.  Regular employees shall not be deprived of their sixth punch by the use of extra help.  Except in cases specifically agreed upon between the Employer and the Union, work on the night shift shall be treated as being performed on the day on which the shift ends.  The holiday night shall not be staggered by the splitting of a single shift.

(D)    If any of the above-named holidays occur when an employee is on vacation, that employee may elect an optional day off, in lieu of the holiday, with pay; provided that this optional day off would be selected by mutual agreement with the Company.

(E)    If a part-time employee works eight (8) hours on any given holiday, that part-time employee will receive in addition to pay for hours worked on that holiday, eight (8) hours pay at regular time for holiday pay.

(F)    Bids must be posted no later than seven (7) days prior to holiday work schedules except where last minute operational changes would require bid adjustment.

## ARTICLE 16
### VACATIONS

(A)    Employees who have been on the Employer's payroll for one year and who have worked at least one hundred and thirty-five (135) days during that year including any absence resulting from the performance of duties under this Agreement, shall be entitled to one week's vacation with pay in each year to be taken during the vacation period provided in subsection (C) hereof.  The requirement of 135 days of employment applies only to the first year of employment.  After the first year of employment, an employee must work 25 days to qualify for vacation

New employees hired during the previous year who are entitled to a vacation and older employees who do not work a full year shall receive vacation pay equal to the average of their earnings for the full weeks which they worked in that year, with minimum of forty (40) hours.

All regular employees shall receive their vacation pay due them in advance on the basis of their earnings for the previous calendar year ending December 31st, one-fifty-second (1/52nd) of their earnings for each week of vacation but not less than forty (40) hours pay per week.

Any employee who is discharged or who quits between January 1st and December 31 shall receive the vacation allowance due him for that year.

(B) | YEARS OF SERVICE | VACATION DAYS |
|---|---|
| 1 | 5 |
| 2 | 10 |
| 3 | 12 |
| 4 | 13 |
| 5 | 15 |
| 12 | 20 |
| 20 | 25 |

(C)    No employee entitled to a vacation, may be forced to work overtime the day before commencement of such scheduled vacation.  Vacation must be taken between January 1 and December 31st unless otherwise mutually agreed to between the Employer and the Union, and any employee who has completed the required service before or within the vacation period shall be granted a vacation as provided herein.

(B)   All time worked in any one day in excess of eight (8) hours shall be paid at time and one-half.  Hours worked in excess of forty (40) hours in any one week shall be paid at the rate of time and one half. A holiday which falls during an employee's regular workweek shall count as a punch, whether or not actually worked by the employee.

(C)   All hours worked on the sixth (6) consecutive day shall be paid at time and one-half.  All hours worked on the seventh (7) consecutive day shall be paid at the rate of double time.  However, rates of pay for Sunday shall be at double time rates as set forth in section (A) above.  All hours worked on a premium day, in excess of eight (8), shall be paid at one and one-half (1-1/2) the applicable premium rate.

(D)   Any full-time employee assigned to a shift which begins at or after 2:00 P.M. or before 6:00 A.M. shall receive a shift differential of four dollars ($4.00) per day and two dollars ($2.00) per day for any part-time employee.

(E)   An employee who notifies his supervisor at the start of the shift of an emergency or pressing personal business which cannot be done at any other time except at the end of that shift shall be excused of their obligation to work overtime that day; however, it is specifically understood that another employee may be required to do this overtime assignment if no other arrangements can be made.

(F)   The Company agrees not to schedule full-time employees to work more than ten (10) hours per day or part-time employees more than five (5) hours per day, provided it is clearly understood that in the event of an emergency as declared by the district opera-tions manager this restriction will not apply.

ARTICLE 19

NEW POSITIONS - VACANCIES

(A)   All new positions or vacancies, as they occur, will be promptly posted in the station.  Employees desiring to bid for such positions shall file their applications with the Employer within five (5) days from the date of posting.  The assignment will be made within a period of ten (10) days.  The Union agrees that the right to create and post work schedules to reasonably meet the requirements of flight schedules is a right of the Employer, and such schedules may be changed to meet the requirements with-out interference of the Union.  The Employer will post only starting times and classi-fications for bidding as vacancies arise or schedule changes that occur by noon Wednesday to be effective Monday to be removed by noon Friday and reposted by 5:00 P.M. Friday.

(B)   The Company will establish an annual bid for all full-time and part-time employees in December of each contract year.

ARTICLE 20

BONDS

Should the Employer require any employee to give bond, cash bond shall not be compul-sory, and any premium involved shall be paid by the Employer.  The primary obligation to procure the bonds shall be on the Employer.  If the Employer cannot arrange for a bond within ninety (90) days, he must so notify the employee in writing.  Failure to so notify shall relieve the employee of the bonding requirement. If proper notice is given, the employee shall be allowed thirty (30) days from the date of such notice to make his own bonding requirements, standard premiums only on said bond to be paid by the Employer.  A standard premium shall be that premium paid by the Employer for bonds applicable to all other of its employees in similar classifications.  Any excess premium is to be paid by the employee.  Cancellation of a bond after once issued shall

not be cause for discharge unless the bond is canceled for cause which occurs during working hours, or due to the employee having given a fraudulent statement in obtaining said bond.

## ARTICLE 21
### EXAMINATIONS

All examinations when required by the Employer and performed under his direction shall be paid for by the Employer. Employees other than applicants shall be paid for all time required to take all such examinations, not to exceed two (2) hours at the straight time hourly rate of pay.

## ARTICLE 22
### PERSONAL IDENTIFICATION

If the Employer requires employees to carry personal identification, the cost of such personal identification shall be borne by the Employer.  Security badges are required.

## ARTICLE 23
### INJURY ON THE JOB AND COMPENSATION

An employee who is injured on the job, and is sent home, or to a hospital, or who must obtain medical attention, shall receive pay at the applicable hourly rate for the balance of his/her regular shift on that day or for a guarantee of eight (8) hours pay for the day injured for full-time employees and four (4) hours of pay for part-time employees.  An employee who has returned to his/her regular duties after sustaining a compensable injury who is required by the workman's compensation doctor to receive additional medical treatment during his/her regular scheduled working hours shall receive his/her regular hourly rate for pay for such time.  Should an employee be required to travel for the purpose of obtaining treatment he/she will receive a guarantee of eight (8) hours pay.  If this required treatment visit falls outside normal working hours, he/she shall be paid for the time involved in travel and treatment, but not for more than two (2) hours at his/her normal straight time rate of pay.

## ARTICLE 24
### LOSS OR DAMAGE

Employees shall not be charged for loss or damage unless clear proof of gross negligence is shown.  This Article is not to be construed as permitting charges for loss or damage to equipment under any circumstances.

## ARTICLE 25
### ACCESS TO PREMISES

Authorized agents of the Union shall have access to the Employer's establishment during working hours, including the right to check trucks in transit, investigate working conditions, collect dues, and inspect all time cards, log books, and other payroll records of the Employer, for the purpose of determining whether or not the terms of this Agreement are being complied with.  The Employer will make such records available within seven (7) days of the Union's request and will provide a suitable bulletin board in a conspicuous place for posting of information of interest of the members of the Union.

## ARTICLE 26
### DEATH IN FAMILY

In the event of a death in the Employee's immediate family:  i.e., father, mother, sister, brother, son, daughter, husband, wife, grandfather, grandmother, mother-in-law,

14

father-in-law, stepparents, and stepchildren, it is recognized that the employee may need time off to attend the funeral services. A leave of absence will be granted to an employee for the day of burial, the three days preceding the day of burial in the case of a death of the employee's father, mother, son, daughter or spouse, and for the day of burial and the day after the burial, and the two days preceding the day of burial for all other members of the immediate family. When these days fall within the regular work week the Employer will pay to the employee his regular straight time pay for eight (8) hours per day for such days of absence for full-time employees and four (4) hours pay for part-time employees.

### ARTICLE 27
### JURY DUTY

Employees will receive the difference between forty (40) hours for full-time employees and the difference between twenty (20) hours for part-timers at their straight time regular rate of pay and whatever compensation plus expenses earned while serving on jury duty .

### ARTICLE 28
### TRAINING

Any bargaining unit employee assigned to training will train other employees only on a voluntary basis.

### ARTICLE 29
### CREDIT UNION

The Employer agrees to deduct certain specific amounts each week from the wages of those employees who shall have given the Employer written authorization to make such deductions. The amounts so deducted shall be remitted to the Teamsters Credit Union once each week. The employer shall not make deductions and shall not be responsible for remittance to the credit union for any deductions for those weeks during which the employee has no earnings or in those weeks in which the employee's earnings shall be less than the amount authorized for deduction.

### ARTICLE 30
### MEAL PERIOD

Employees shall be allowed a thirty (30) minute lunch break which shall not begin until the employee has worked four (4) hours, but must begin before the employee has completed six (6) hours of work.

Any employee who is ordered to work during any part of their thirty (30) minute meal period shall be paid for the full meal period and shall be allowed and must take twenty (20) minutes to eat lunch and such time shall be considered as time worked. An employee who is ordered to work during any part of their thirty (30) minute meal period shall receive a minimum of eight and one half (8 1/2) hours' pay on that day.

### ARTICLE 31
### MATERNITY LEAVE

(A)    When the employee learns of her pregnancy, she will present her employer with proper verification by her doctor of her pregnancy, and of her ability to continue on her job. During the period when the pregnant employee is still actively employed, the employer may require a periodic report from the employee's doctor timed with the employee's scheduled visits to her doctor. The employee may continue work so long as

her doctor's reports indicate that the employee's job conditions will not be detrimental to her health and that she is capable of performing her normal duties.

(B)   At such time as the employee's physician feels that continued active employment is no longer indicated, the employer will grant a leave of absence to such employee not to exceed six (6) months from the date of termination of pregnancy.

(C)   An employee failing to return within six (6) months after the date of termination of pregnancy, shall lose her seniority rights and be removed from the employer's seniority list, unless the employee's doctor certifies that the employee is medically unable to perform her regular duties.

(D)   After such six (6) month period, the employee must return to work in order to maintain her seniority, unless she presents written medical proof she is not able to perform her normal duties.

(E)   Upon termination of the pregnancy, the employee may return to work within six (6) months of termination upon presenting written medical proof she is capable of performing her duties.

(F)   The part-time employee who is scheduled, or the person who is hired to replace the full-time employee on maternity leave shall not under any circumstances be considered a full-time employee or be counted as a part-time employee in the calculations of allowable part-time employees pursuant to Article 32.  Any person who is currently employed and assigned as replacement for the employee on maternity leave shall not lose any contractual rights.

In accordance with the Family and Medical Leave Act (FMLA) of 1993, it is the policy of this Company to grant up to twelve (12) weeks of family and medical during any 12 month period to eligible employees.  An employee taking Family Leave may elect to first accrued vacation or floating holidays, if any, as part of his/her family leave.  The length of any approved unpaid family medical leave shall be reduced by the number of paid days elected.

Employees are eligible if they work at a local where there are at least fifty (50) Company employees within seventy-five (75) miles, have worked for the Company for at least one year, and have worked at least 1,250 hours over the previous twelve (12) months.

Leave will be granted for any of the following reasons:

   *  to care for the employee's child after birth, or placement for adoption or foster care;
   *  to care for the employee's spouse , son or daughter, or parent who has a serious health condition; or
   *  for the employee's serious health condition that makes him/her unable to perform his/her job.

The leave will be unpaid, except that portion covered by accrued vacation or floating holidays, or unless a collective bargaining agreement otherwise provides for paid leave.

The employee will be required to provide advance leave notice and medical certification.  A leave request may be denied if the requirements are not met.

   *  The employee must provide thirty (30) days advance notice when the leave is "foreseeable."

- The Company may require medical certification to support a request for leave because of a serious health condition.  The Company may require second or third medical opinions (at the Company's expense).

## ARTICLE 32
### PART-TIME EMPLOYEES

The Employer may utilize regular part-time employees on a scheduled basis to cover regular recurring work periods, and to replace absenteeism; and part-time casual employees on an on-call basis, to cover overflow situations and to replace absenteeism.

A new part-time employee shall be hired on a thirty (30) calendar days' trial basis within which time they may be dismissed without protest by the Union.  After thirty (30) days trial period they shall be placed on a separate seniority list in accordance with their date of hire provided, however, a new part-time employee must work a minimum of 80 hours during this thirty (30) day trial period.  The foregoing test of time shall not include vacation or maternity leave hours, with respect to which the part-time employee shall sign a written waiver, with a copy to the Local Union.

Part-time employees may only be utilized from Monday to Friday inclusive except that any regular part-time employee hired after the effective date of this Agreement may be forced to accept Saturday, Sunday or holiday work refused by full-time employee(s). (See Article 11(h)). Any part-time employee who is called and reports as scheduled shall be guaranteed four (4) hours work or pay.  The Company would be willing to notify the part-time employee of the extension of his or her shift prior to completion of the third hour (as opposed to "promptly"), except in the case of an emergency as declared by the district operations manager.  When the company extends the shift of a part-time employee beyond four (4) hours, the company shall promptly notify the employee once it becomes aware of the situation.

The Employer shall remit contributions on behalf of all part-time employees (regular & casual) to the respective Health & Welfare and Pension Funds and regular part-time employees shall be entitled to accrue vacation pay equal to 1/52 of their earnings for each week (week = 5 days see Article 16 paragraph (b)) of vacation but not less than 20 hours pay per week.

Part-time casual employees shall not be entitled to vacation, sick leave, holiday, or jury duty under the terms of this Agreement.

Permanent full-time vacancies shall be offered to regular part-time employees in order of seniority.  A regular part-time employee accepting a full-time position shall receive a new seniority date, which shall be the first day that he works as a new full-time employee.  Regular part-time employees that turn down full-time vacancies, will retain the right to bid for future full-time vacancies.

The Employer may give consideration to part-time casuals for permanent part-time vacancies.

Part-time employees shall be covered under a separate seniority list from the full-time seniority list.

The Company shall not use part-time employees to displace any full-time shift bid existing on the effective date of this Agreement, provided however this shall not be construed to limit the right of the Company to make bid changes in response to business needs.

The Company and Union agree that it is not the intent of this Article to subvert the creation of additional full-time jobs, where there is eight (8) consecutive hours of work available, on a regular basis. Accordingly, the Company agrees that it will not schedule part-time employees in back-to-back shifts covering eight (8) consecutive hours. In addition, in the event that the Company works a part-time employee on the same starting time for eight (8) consecutive hours per day, thirty (30) days during a sixty (60) day period, excluding replacement, then the Company shall add a full-time position.

The following provisions covering operational employees changing their status from full-time to part-time are as follows:

1. Part-time openings will be posted to offer all full-time employees the opportunity to change their status to part-time before filling the position from the street.

2. Part-time positions will be filled according to full-time seniority.

3. A full-time employee going to a part-time position will be considered a new part-time employee with a new seniority date for bidding purposes only. Employee will retain original seniority date for benefit purposes only and that employee will be added to the part-time seniority list and removed from the full-time seniority list for bidding purposed in accordance with Article 11, paragraph (A) of this Agreement.

4. Any full-time employee going to a part-time position can be forced to accept Saturday, Sunday, or Holiday work refused by full-time employees.

5. In the event of a layoff, it is agreed that the employees new part-time seniority date shall be the determining factor, not company seniority.

The foregoing shall only apply to part-time hours worked after the effective date of this Agreement.

## ARTICLE 33
### UNIFORMS

The Employer agrees that if any employee is required to wear any kind of uniform as a condition of his continued employment, such uniform shall be furnished and maintained by the Employer, free of charge, at the standard required by the Employer.

The Employer shall replace all clothing, glasses, hearing aids and/or dentures not covered by company insurance or workmen's compensation which are destroyed or damaged in a wreck or fire with company equipment.

The Employer has the right to establish and maintain reasonable standards for wearing apparel and personal grooming.

## ARTICLE 34
### MILITARY CLAUSE

Employees enlisting or entering the military or naval service of the United States, pursuant to the provisions of the Military Selective Service Act of 1967, as amended, shall be granted all rights and privileges provided by the Act.

The Employer shall pay the Health and Welfare and Pension Fund contributions on employees on leave of absence for training in the military reserves or National Guard, but

not to exceed fourteen (14) days, providing such absence affects his credits or coverage for Health and Welfare and/or Pensions.

### ARTICLE 35
### POSTING OF AGREEMENT

A copy of this Agreement shall be posted in a conspicuous place in each garage and terminal.

The Employer agrees to provide suitable space for the Union bulletin board in each garage, terminal or place of work.  Postings by the Union on such boards are to be confined to official business of the Union.

### ARTICLE 36
### UNION AND EMPLOYER COOPERATION

The Union, its members and the Employer agree at all times as fully as it may be within their power to further their mutual interest and interests of the Airfreight industry and the International Brotherhood of Teamsters nationwide.

The purpose of this statement of principle is to protect the long range interests of the employees, the Company, the Union and the general public served.

### ARTICLE 37
### UNION ACTIVITIES

Any employee member of the Union acting in any official capacity whatsoever shall not be discriminated against for his acts as such officer of the Union so long as such acts do not interfere with the conduct of the Employer's business, nor shall there be any discrimination against any employee because of union membership or activities.

### ARTICLE 38
### SEPARATION OF EMPLOYMENT

Upon discharge the Employer shall pay all money due to the employee during the first payroll department working day.  Failure to do so shall subject the Employer to pay liquidated damages in the amount of eight (8) hours pay for each day of delay.  Upon quitting, the Employer shall pay all money due to the employee on the pay day in the week following such quitting.

### ARTICLE 39
### SEPARABILITY AND SAVINGS CLAUSE

If any Article or Section of this Agreement or of any Supplements or Riders thereto should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement and of any Supplements or Riders thereto, or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

In the event that any Article or Section is held invalid or enforcement of compliance with which has been restrained, as above set forth, the parties affected thereby shall enter into immediate collective bargaining negotiations after receipt of written notice of the desired amendments by either Employer or Union for the purpose of arriving at a mutually satisfactory replacement for such Article or Section during the period of

invalidity or restraint. There shall be no limitation of time for such written notice. If the parties do not agree on a mutually satisfactory replacement within sixty (60) days after receipt of the stated written notice, either party shall be permitted all legal or economic recourse in support of its demands notwithstanding any provisions of this Agreement to the contrary.

### ARTICLE 40
### GARNISHMENTS

In the event of notice to any Employer of a garnishment or impending garnishment, the Employer may take disciplinary action if the employee fails to satisfy such garnishment within a seventy-two (72) hour period (limited to working days) after notice to the employee. However, the Employer may not discharge any employee by reason of the fact that his earnings have been subject to garnishment for any one indebtedness. If the Employer is notified of three garnishments irrespective of whether satisfied by the employee within seventy-two (72) hour period, the employee may be subject to discipline, including discharge in extreme cases. However, if the Employer has an established practice of discipline or discharge with a fewer number of garnishments or impending garnishments if the employee fails to adjust the matter within the seventy-two (72) hour period, such past practice shall be applicable in those cases.

### ARTICLE 41
### EMPLOYEE'S BAIL

Employees will be bailed out of jail if accused of any offense in connection with the faithful discharge of their duties, and any employee forced to spend time in jail or in courts shall be compensated at his regular rate of pay. In addition, he shall be entitled to reimbursement for his meals, transportation, court costs, etc. Provided, however, that faithful discharge of duties shall in no case include compliance with any order involving commission of a felony. In case an employee shall be subpoenaed as a Company witness he shall be reimbursed for all time lost and expenses incurred.

### ARTICLE 42
### NONDISCRIMINATION

Section 1.    In accordance with applicable law, the Employer and the Union agree not to discriminate against any individual with respect to hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, sex, national origin, pregnancy, or age, nor will they limit, segregate or classify employees in any way to deprive any individual employee of employment opportunities because of race, color, religion, sex, national origin, pregnancy, or age.

Section 2.    The Company and the Union agree that there will be no discrimination by the Company or the Union against any employee because of his or her membership in the Union or because of any employee's lawful activity and/or support of the Union.

Section 3.    The term "he" or "his" as used in this Agreement is not meant to be discriminatory and shall apply equally to male and female employees.

### ARTICLE 43
### WAGES

(A)    On the effective date of this contract, all existing job classifications (i.e.) part-time, clerk, agent (1st year), agent (2nd year), agent (3rd year), lead agent, lead agent supervisor, shall be merged into a single all encompassing job classification of "operations agent." This classification shall include all job duties to be performed on the applicable shift.

|                        | 4/1/98    | 4/1/99    | 4/1/00    | 4/1/01    | 4/1/02    |
|------------------------|-----------|-----------|-----------|-----------|-----------|
| Hired After<br>1/1/85  | $14.70    | $15.20    | $15.70    | $16.20    | $16.70    |
| Agent                  | $17.70    | $18.20    | $18.70    | $19.20    | $19.70    |

A one time signing bonus shall be paid on ratification of the contract as follows: full-time employees on the seniority list shall receive $1,600; part-time employees on the seniority list shall receive $800.

(C)    The Employer agrees that any employee receiving a weekly rate in excess of the rate applicable under the above schedule shall suffer no reduction in pay by virtue of the adoption of this Agreement.

(D)    The wage rate and job classifications of regular full-time employees covered by this Agreement shall be those set forth in the wage scale and by this reference made a part hereof.  The job classifications set forth in the wage scale are not to be deemed specifications or descriptions of the work done by an employee in a job classification. The work to be done by an employee in any job classification shall be determined solely by the Employer in conjunction with the bidding process.

## ARTICLE 44
## HEALTH AND WELFARE

(A)    Commencing with the 1st day of April, 1998, and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the respective Health and Welfare Funds for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or non-member of this Local Union employee, irrespective of his status as a member or non-member of this Local Union the first hour of employment subject to this collective bargaining agreement as follows:

(B)    Commencing with the 1st day of April, 1998 the Employer shall contribute to the respective Health and Welfare Funds the sum of $3.76¾ per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $150.50 per week for any one employee.

Commencing with the 1st day of April, 1999, the Employer shall contribute to the respective Health and Welfare funds, the sum of $3.76¾ per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $150.50 per week for any one employee.

Commencing with the 1st day of April 2000, the Employer shall contribute to the respective Health and Welfare Funds, the sum of $4.16¾ per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $166.50 per week for any one employee.

Commencing with the 1st day of April 2001, the Employer shall contribute to the respective Health and Welfare Funds, the sum of $4.41¾ per hour figured to the nearest quarter hour for which an employee covered by this Agreement receives pay up to a maximum of forty (40) hours but not more than $176.50 per week for any one employee.

Commencing with the 1st day of April 2002, the Employer will contribute to the respective Health and Welfare Funds, the sum of $4.46¾ per hour figured to the nearest quarter hour for which an employee covered under this Agreement receives pay up to a maximum of 40 hours but not more than $178.50 per week for any one employee.

21

Commencing with the 1st day of April, 1998, and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer agrees to make payments to the respective Health and Welfare Funds as follows:

(1)    The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of all regular employees who may be on layoff status during any payroll period but has completed three (3) days of work in that payroll period.

For the purposes of this Article, each hour paid for or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is received by the employee shall be counted as hours for which contributions are payable.

If a regular employee is absent because of illness or off-the-job injury and notifies the employer of such absence, the Employer shall continue to make the required contribution of 32 hours for a period of four (4) weeks. If a regular employee is injured on the job the Employer shall continue to pay the required contributions until such employee returns to work; however, such contributions of 32 hours shall not be paid for a period of more than twelve (12) months.

There shall be no deduction from equipment rental of owner operators by virtue of the contributions made to the Health and Welfare Fund, regardless of whether the equipment rental is at the minimum rate or more, and regardless of the manner of computation of owner-driver compensation.

Hourly contributions to the Health and Welfare Fund must be made for each hour worked on each regular or extra employee, even though such employee may work only part-time under the provisions of this contract, including weeks where work is performed for the Employer but not under the provisions of this contract, and although contributions may be made for those weeks into some other Health and Welfare Fund. Full contribution will be made for a part-time employee who works more than five (5) hours per day.

In the case of employees paid on a mileage basis, the number of hours of contribution to the Health and Welfare Fund shall be determined by dividing that employee's gross earnings for the week by the current hourly rate. Gross earnings shall include any other hours paid for, such as waiting time, breakdown time, pick-up and drop-off time, subject to the maximum weekly amount of contributions set forth above, not to exceed forty (40) hours per week per employee.

All contributions shall be made at such time and in such manner as the Trustees require, and the Trustees shall have the authority to have an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Welfare Fund.

If an Employer fails to make contributions to the Welfare Fund within 72 hours after the notice of delinquency set forth in this Agreement, the Local Union shall take whatever steps are necessary to secure compliance with this Article, any provisions of this Agreement to the contrary notwithstanding, and the Employer shall be liable for all costs for collecting the payments due together with attorneys' fees and such penalties which may be assessed by the Trustees.

The Employers' liability for payment hereunder shall not be subject to the Grievance Procedure or arbitration provided under this Agreement.

(C)    The Employers and Union which are signators hereto ratify the designation of the Employer and the Employee Trustees under such Agreement, and ratify all action already taken, or to be taken by such Trustees within the scope of their authority.

(D)    All Employers contributing hereunder shall post each month at each terminal or other place of business where employees have easy access thereto an exact copy of the remittance report form of contributions sent to the Fund.

(E)    Whenever an Employer signatory to this Agreement becomes delinquent in contributions owed to the Health and Welfare Fund and the Local Union serves a 72-hour notice of delinquency set forth in this Agreement, such Employer after satisfying the delinquency and becoming current, and then during the term of this Agreement becomes delinquent again, shall be required to post a performance bond to satisfy that second delinquency and/or any further delinquencies during the term of this Agreement.

(F)    In the event the Negotiating Committee of the National Freight Agreement shall decide to apply additional increases to the Health and Welfare Fund, the Employer shall upon receipt of written notice from the Union, increase its contributions to the Teamsters Local No. 25 Health and Welfare Fund in the amounts indicated on the same effective dates.

### ARTICLE 45
### PENSIONS

This Pension Article shall supersede and prevail over any other inconsistent provisions or articles contained within this agreement.

(A)    Commencing with the 1st day of April, 1998 and for the duration of the current collective bargaining agreement between Local Union 25 and the Employer, and any renewals or extensions thereof, the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement, whether such employee is a regular, probationary, temporary or casual employee, irrespective of his status as a member or a nonmember of the Local Union, from the first hour of employment subject to this collective bargaining agreement as follows:

For each hour or portion thereof, figured to the nearest quarter hour for which an employee receives pay or for which pay is due the Employer shall make a contribution of $3.46 per hour to the New England Teamsters and Trucking Industry Pension Fund but not more than $138.40 per week for any one employee from the first hour of employment in such week.

Commencing with the 1st day of April, 1999 the said hourly contribution rate shall be $3.76 but not more than $150.40 per week for any one employee and,

Commencing with the 1st day of April, 2000 the said hourly contribution rate shall be $3.91 but not more than $156.40 per week for any one employee and,

Commencing with the 1st day of April, 2001 the said hourly contribution rate shall be $4.06 but not more than $162.40 per week for any one employee and,

Commencing with the 1st day of April, 2002 the said hourly contribution rate shall be $4.21 but not more than $168.40 per week for one employee.

Commencing with the 1st day of April, 1998 and for the duration of the current collective bargaining agreement and any renewals or extensions thereof, the Employer

agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund as follows:

(1)   The Employer agrees to make contributions up to a maximum of forty (40) hours in behalf of all regular employees who may be on layoff status during any payroll period but has completed three (3) days of work in that payroll period.

For purposes of this section, each hour for which wages are paid or due, or any portion thereof, figured to the nearest quarter hour, as well as hours of paid vacation, paid holidays and other hours for which pay is due or received by the employee, shall be counted as hours for which contributions are payable. In computing the maximum amount due any week, there shall be no daily limit on the number of hours for any one day in such week, whether such hours are performed on straight time or overtime rates, but payments shall be made at the amount set forth above.

In the case of employees paid on a mileage basis, the number of hours of contributions to the Pension Fund shall be determined by dividing that employee's gross earnings for the week by the current hourly rate. Gross earnings shall include any other hours paid for, such as waiting time, breakdown time, pick-up and drop-off time, subject to the maximum weekly amount of contributions set forth above, not to exceed forty (40) hours per week per employee.

If a regular employee (as defined in the collective bargaining agreement) is absent because of illness or off-the-job injury and notifies the Employer of such absence, the Employer shall continue to make the required contributions for a period of four (4) weeks for forty (40) hours per week. If an employee is injured on the job, the Employer shall continue to pay the required contributions at the rate of forty (40) hours for each such week until the employee returns to work; however, such contributions of forty (40) hours shall not be paid for a period of more than twelve (12) months.

(B)   The Employer agrees to and has executed a copy of the New England Teamsters and Trucking Industry Pension Fund Agreement and Declaration of Trust dated April 11, 1958, and accepts such Agreement and Declaration of Trust, as amended, and ratifies the selection of the Employer Trustees now or hereafter serving as such, and all action heretofore or hereafter taken by them within the scope of their authority under such Agreement and Declaration of Trust.

(C)   The parties agree that the Pension Plan adopted by the Trustees of the New England Teamsters and Trucking Industry Pension Fund shall at all times conform to the requirements of the Internal Revenue Code so as to enable the Employer at all times to treat its contributions made to the Fund as a deduction for income tax purposes.

(D)   It is also agreed that all contributions shall be made at such time and in such manner as the Trustees shall reasonably require; and the Trustees shall have the authority to have an audit of the payroll and wage records of the Employer for all employees performing work within the scope and/or covered by this collective bargaining agreement for the purpose of determining the accuracy of contributions to the Pension Fund and adherence to the requirements of this Article of the collective bargaining agreement regarding coverage and contributions, such audit may, at the option of the Trustees, be conducted by an independent certified public accountant or a certified public accountant employed by the New England Teamsters and Trucking Industry Pension Fund.

If the Employer shall fail to make contributions to the Pension Fund by the twentieth (20th) day of the month following the month during which the employees per-

formed work or received pay or were due pay within the scope of this collective bar-
gaining agreement, up to and including the last completed payroll period in the month
for which contributions must be paid, or if the Employer, having been notified that its
contributions to the Fund have been under reported and/or underpaid, fails within
twenty (20) days after such notification to make any required self-audit and/or contri-
butions found to be due, the Local Union shall have the right after an appropriate 72-
hour notice to the Employer, to take whatever steps it deems necessary to secure com-
pliance with this Agreement, any provision of this collective bargaining agreement to
the contrary notwithstanding, and the Employer shall be responsible to the employees
for losses resulting therefrom.  Also, the Employer shall be liable to the Trustees for
all costs of collecting the payments due together with attorneys' fees and such inter-
est, liquidated damages or penalties which the Trustees may assess or establish in
their discretion.  The Employer's liability for payment hereunder shall not be subject
to the grievance procedure and/or arbitration if such is provided in this Agreement.

It is understood and agreed that once a payment or payments are referred to an
attorney for collection by the Trustees of the New England Teamsters and Trucking
Industry Pension Fund and/or the Local Union, the Local Union and its business agents
or chief executive officer shall have no right to modify, reduce or forgive the
Employer with respect to its liability for unpaid contributions, interest, liquidated
damages or penalty as may be established or assessed by the Trustees in their discre-
tion against delinquent Employers.

There shall be no deduction for equipment rental of owner-operators by virtue of
the contributions made to the Pension Fund, regardless of whether the equipment rental
is at the minimum rate or more, and regardless of the manner of computation of owner-
driver compensations.

(E)   Contributions to the Pension Fund must be made for each week on each regular or
extra employee, even though such employee may work only part-time under the provisions
of this contract, including weeks where work is performed for the Employer but not
under the provisions of this contract, and, although contributions may be made for
those weeks into some other Pension Fund.

(F)   No oral or written modification of this section regarding pensions and retirement
shall be made by the Local Union or the Employer and, if made, such modification shall
not be binding upon the employees performing work within the scope of this collective
bargaining agreement and covered by this section or upon the Trustees of the New
England Teamsters and Trucking Industry Pension Fund.

(G)   All Employers contributing hereunder shall post each month at each terminal or
other place of business where employees have easy access thereto an exact copy of the
remittance report form of contributions sent to the Fund.

(H)   Whenever an Employer signatory to this Agreement becomes delinquent in contribu-
tions owed to the Pension Fund and the Local Union serves a 72-hour notice of delin-
quency set forth in this Agreement, such Employer after satisfying the delinquency and
becoming current, and then during the term of this Agreement becomes delinquent again,
shall be required to post a performance bond to satisfy that second delinquency and/or
any further delinquencies during the term of this
Agreement.

(I)   In the event the Negotiating Committee of the National Freight Agreement shall
decide to apply additional increases to the Pension Fund, the Employer shall upon
receipt of written notice from the Union, increase its contributions to the New England
Teamsters & Trucking Industry Pension Fund on the same effective dates, in the amounts
indicated on the same effective dates.

J) Employees may contribute to the Teamsters 401(K) plan.

## ARTICLE 46
### BREAKS

Supervisors shall schedule with their employees a mutually acceptable break schedule, taking into account operational considerations at all times.

## ARTICLE 47
### LIE DETECTOR

The company shall not require, request, or suggest that an employee or applicant for employment take a polygraph or any other form of lie detector test.

## ARTICLE 48
### ALCOHOL AND DRUG TESTING

The parties hereby incorporate by reference the Uniform Drug Testing guidelines as outlined in the National Master Freight Agreement.

## ARTICLE 49
### PART-TIME TO FULL-TIME HIRING RATIO POLICY

1.    A part-time employee is defined as one who works a schedule of four (4) hours minimum or five (5) hours maximum per shift.  A part-time employee may work no more than one shift per working day.

2.    The five (5) hour maximum may be extended only in so-called "Emergency" situations as defined in Article 32, Paragraph 2 of this Agreement.

3.    The company agrees that after the effective date of this agreement and when the Boston Metroplex growth exceeds for each twenty-five (25) percent growth from prior year, one (1) full-time position will be added to the seniority list.

4.    All additional full-time job vacancies shall be filled from the part-time list, according to seniority.

5.    The company agrees to repost the full-time bid whenever a full-time employee is absent for more than thirty (30) days.

6.    Vacation relief positions shall be filled by full-time employees.  If any openings remain, they may be filled by part-time employees.

7.    No full-time employee may be laid off as long as there are part-time employees working.

8.    The number of part-time employees will not exceed the number of full-time employees.

## ARTICLE 50
### CHANGE OF OPERATIONS

Change of Operations Committee

(a)    Present terminals, breaking points or domiciles shall not be transferred, changed or modified without the approval of an appropriate Change of Operations Committee.

Such Committee shall be appointed in each of the Regional Areas, equally composed of Employer and Union representatives.  The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

In the event a proposed change of operations includes the establishment of either a new or satellite terminal as a "combination" facility with a common city driver and dock seniority roster, when such change of operations results in the relocation or movement of city drivers and dock employees from an existing terminal recognizing separate (split) seniority rosters for city drivers and dock employees, the Change of Operations Committee shall have the authority to determine the conditions under which such a combination facility may be established, including but not limited to, the number of city drivers and dock employees who qualify, be allowed to follow the work to the new or satellite combination terminal, the implementation of training programs to qualify dock employees as city drivers and the seniority right of affected employees to either return to the "mother" terminal and/or claim additional driving positions at the satellite terminal within reasonable time periods following the establishment of such combination terminal, as determined by the Committee.  Existing terminals that recognize separate city driver and dock seniority rosters (split terminals) shall not be converted to 'combination" terminals unless and until such time as a majority of those affected employees agree to such conversion, in which case the Change of Operations Committee shall have the authority to determine the conditions under which such conversion shall be implemented.

Such Committee, however, shall observe the Employer's right to designate domiciles and the operational requirements of the business.  Where the Union raises the question as to whether or not certain proposed runs of excessive length can be made, the Employer must be prepared to submit objective evidence including DOT certification or logs and tapes that such runs have been tested and were made within the DOT hours of service regulations.  Individual employees shall not be redomiciled more than once during the term of this Agreement as the result of an approved change of operations unless a merger, purchase, sale, acquisition or consolidation of employers is involved, or unless there is proven economic need as determined by the Change of Operations Committee based on factual evidence presented.

Pension and health & welfare contributions paid on behalf of a redomiciled employee shall be paid to the Funds to which the contributions were made prior to the employee's change of domicile, and the decisions of the Change of Operations Committee shall so specify.  This Section does not apply to employees who voluntarily transfer to new domiciles, unless such transfer is a result of a Change of Operations Committee decision.  Any dispute concerning the appropriate fund for an Employer's contribution on behalf of a redomiciled employee, pursuant to a Change of Operations Committee decision, shall be referred to the National Grievance Committee.  The decision of the National Grievance Committee shall to the extent permitted by law, be final and binding on all affected parties, including the Trust Funds.

The Change of Operations Committee shall also have jurisdiction for a period of twelve (12) months following the opening of a new terminal to consider the redomicile of employees who are laid off as a direct result of such opening of a terminal.  The Committee shall also have jurisdiction over the closing of a terminal in regard to seniority, as well as to determine the conditions under which freight may or may not be interlined into the area of a vacated operations when necessary to retain major customers, including mandating the use of union carriers where available.  In no event will the Employer be granted the authority to vacate a facility and interline the freight on a non-union subsidiary of the parent company.

The above shall not apply within a twenty-five (25) - mile radius.

The Change of Operations Committee shall have the authority to require a definition of primary and shared lanes, where applicable.

The Change of Operations Committee shall not grant the Employer authority to relocate U.S. operations, work, or terminals to Mexico.

Change of Operations Committee Procedure

(b)    The National Grievance Committee shall adopt Rules of Procedure concerning the application and administration of this Article.

The Employer shall notify all affected Local Unions of the proposed change of operations at least twenty (20) calendar days prior to the hearing at the Regional Joint Area Committee, and the Employer and the Local Unions involved shall have a mutual responsibility to inform the employees subject to redomicile prior to such hearing in accordance with the practice and procedures agreed to in the respective Area Committee.  Any exception or waiver of the aforesaid twenty (20) day period shall be mutually agreed to between the Employer and the Local Unions involved and approved by the Regional Area Change of Operations Committee.

Moving Expenses

(c)    Where an employee is required to transfer to another domicile in order to follow employment as a result of a change of operations, the Employer shall move the employee and assume the responsibility for proven loss or damage to household goods due to such move, including insurance against loss or damage.  Should any employee possess household items of unusual or extraordinary value which will be included in the move, such items shall be declared and an appraised value determined prior to the move.  The Employer shall provide packing materials for the employee's household goods when requested or at the employee's request pay all costs and expenses of moving such household goods, including packing.

The Employer shall pay reasonable expenses to demount and remount an employee's mobile home, if used as his/her residence and in such instance shall pay normal expenses to move such mobile home, including the use of other modes of transportation where required by law.

An employee shall have a maximum of one (1) year to move in accordance with the provisions of an approved change of operations unless, prior to the expiration of such year, he/she requests, in writing, an extension for a reasonable period of time due to an unusual or special problem.  The Employer shall provide lodging for the employee at the point of redomicile, not to exceed ninety (90) calendar days, and in addition, shall reimburse the employee thirty-five cents (35¢) per mile to transport one (1) personal automobile to the new location.

The Employer shall not be responsible for moving expenses if the employee changes his/her residence as a result of voluntary transfer.

None of the Employer obligations set forth in this Subsection (c) - Moving Expenses shall apply to transfers of domiciles within a fifty (50) - mile radius.

Change of Operations Seniority

(d)    The Change of Operations Committee established herein shall have the sole authority to determine questions of the application of seniority in those situations presented to it and in connection therewith the following general rules shall apply, subject, however, to modification as provided by Section 5(g) below:

Closing, Partial Closing of Terminals-Transfer of Work

(1)a. When branches, terminals, divisions or operations (hereinafter "terminal(s)") are closed or partially closed and the work of such terminals) is transferred, in whole or in part, to another terminals), the active employees (excluding those employees on letter of layoff) at the closed or partially closed terminals) shall have the right to bid into a master seniority roster (road or city) comprised of bidders from the active seniority rosters of closed or partially closed terminals) in the order of their continuous classification (road or city) seniority. Continuous classification seniority shall be defined as that seniority which the employee is currently exercising and has not been broken in the manner provided by Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee. Employees shall bid from the combined master seniority roster into openings at the terminals) into which work is being transferred. Employees so transferring shall be 'dovetailed" into the appropriate active seniority roster at the new terminals) in the order of their continuous classification seniority. Such transfers shall be permitted prior to the recall of laid-off employees at such gaining terminals). If and when additional employees are required in excess of those who formed the combined active roster at the point of redomicile, employees on letter of layoff at that location shall be recalled. If recalled, such employees shall be "dovetailed" with their continuous classification seniority.

In addition, the inactive seniority rosters (employees who are on letter of layoff) at the terminals) from which employees are being redomiciled shall be "dovetailed" into a master "laid off' seniority roster and such employees shall have the same opportunities to transfer to terminals) within the area of the Supplemental Agreement which are afforded to employees covered by the provisions of subparagraph 2(b) below. These inactive employees at the losing terminal(s) shall also be offered first work opportunity, in seniority order, at terminals into which work was transferred within the regional area, where such employees were employed. Such inactive employees shall gain active seniority in accordance with the provisions of the applicable supplemental agreement. The use of such employees shall be subject to the order of call of the supplement. The employees' seniority date for bidding and layoff purposes shall be the date which they gain active status. The employee shall retain company seniority for fringe benefits only as of that date.

The senior driver voluntarily laid off at a losing domicile will be restored to the active board each time foreign drivers or casuals (where applicable) make ten (10) trips (tours of duty) within any thirty (30) calendar day period on a primary run of such domicile not affected by a Change of Operations.

b. The following seniority bidding procedures are to be applied in all change of operations cases that involve master pool bidding:

1. The Change of Operations Committee shall have the authority to establish a date for purposes of determining active and inactive (on letter of layoff or the equivalent thereof) employees at both gaining and losing locations.

2. Affected employees at losing locations shall be allowed to bid onto an active master pool seniority list on a dovetailed seniority basis.

3. At the time of the original bid, an employee on the active master pool seniority list shall be afforded the opportunity to bid any available position for which he/she is qualified at a gaining location in accordance with his/her seniority on the master pool seniority list. In the event the active employees at any given location elect not to bid the number of positions being lost at that particular location, inactive employees at that location, in accordance with their seniority, shall then be afforded the

Opening of Terminals

(3)    When a new terminal(s) is opened (except as a replacement for existing operations or a new division in a locality where there are existing operations), the Employer shall offer to those employees, if any, affected thereby the opportunity to transfer to regular positions in the new terminal(s) in the order of such employee's continuous classification (road or city) seniority date as defined herein.  Upon arrival at such new location, such employees shall be "dovetailed" with their continuous classification (road or city) seniority date together with other employees so transferring.

This provision is not intended to cover situations where there is replacement of an existing operation or where a new division is opened in a locality where there is an existing terminal.  In these latter situations, those employees laid off at the exist-ing facilities shall have first (1st) opportunity for employment at the new operation in accordance with their continuous classification (road or city) seniority date, and upon arrival shall be similarly "dovetailed." If all regular full-time positions are not filled in this manner, then the provisions of the preceding paragraph shall apply.

(4)    When a Company which has an established Local Cartage Operation, which has been cleared by system OTR drivers, seeks to establish a new OTR domicile there, the Company shall first file for a Change of Operations giving transfer opportunity, with regard to the initial complement, to OTR drivers from those system OTR domiciles that previously serviced such Local Cartage Operation with reasonable regularity.  Such transfer oppor-tunity shall remain in effect for any additions to the initial complement for a period of not less than 120 calendar days, after which further additions to such complement shall be hired at the locality where such new OTR domicile was established.

(5)    Any employee redomiciled by an approved change of operations or to another domi-cile shall upon reporting to such new domicile be deemed to have relinquished his/her right to return, with seniority, to the domicile from which he/she was transferred, except under another approved change of operations.  Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exer-cise their seniority rights if work becomes available at their original terminal during the five (5) - year layoff period allowed them at their original terminal.

(6) When an Employer's proposed Change of Operations offers a specific number of road positions at a gaining domicile, the Employer shall be required to make every good faith effort and use all practical means to hire qualified applicants to fill such offered positions that are left vacant because other employees affected by the Change have elected not to bid into that gaining domicile.  The Employer's duty to hire under this provision is to use every reasonable means to advertise for qualified applicants and to meet the affected Local Union(s) to seek qualified applicants.  Nothing in this provision shall be construed to create an obligation that the Employer maintain or otherwise guarantee a specific number of employees at a gaining domicile.  Any griev-ance concerning any issue which may arise under this provision shall be filed directly with the Multi-Region Change of Operations Committee.

In the event it is determined by the Multi-Region Change of Operations Committee that the Employer has not made every good faith effort and used all practical means to hire qualified applicants for road positions as required under this provision the Committee may require the Employer to hire qualified applicant(s) as outlined above.

Definition of Terms

(e)    The term "continuous classification seniority as used in this Agreement is defined is that seniority which the employee is currently exercising and has not been

32

broken in the manner provided in Article 5, Section 1, or by voluntary changes in domi-
cile not directed, approved or ordered by a Change of Operations Committee.

Qualifications and Training

(f)    Employees, who are presently non-CDL qualified and elect to bid to transfer to a
gaining terminal that requires CDL qualified employees, shall be provided a sixty (60)
day training period in order to become CDL qualified.  The training period shall com-
mence from the date the employee becomes a successful bidder and the Company shall
furnish training personnel and equipment at the location where the employee is cur-
rently domiciled or otherwise as mutually agreed to.  If the employee fails to qualify
during such sixty (60) day period, the employee shall forfeit his/her right to fill the
bid and shall remain on the seniority list of the domicile.

Intent of Parties

(g)    The parties acknowledge that the above rules are intended solely as general stan-
dards and further that many factual situations will be presented which necessitate dif-
ferent application, modification or amendment.  Accordingly, the parties acknowledge
that questions of the application of seniority rights may arise which require different
treatment and it is anticipated and understood that the Employers and Unions jointly
involved and/or the respective grievance committees may mutually agree to such disposi-
tion of questions of seniority which in their judgment is appropriate under the circum-
stances.

The Change of Operations Committees, as provided herein or in the Supplemental Agree-
ments, shall have the authority to determine the application of seniority in those
situations presented to them.  In all cases, the seniority decisions of the Joint Com-
mittees, including the Change of Operations Committees and subcommittees established by
the National Master Freight Agreement and the respective Supplemental Agreements, shall
be final and binding.

## ARTICLE 51
### EMPLOYEE HARASSMENT

The Company agrees to incorporate the clerical employees under the same 3 member panel
of experts established for the drivers.

## ARTICLE 52
### CASUAL GRIEVANCES

Casuals access to the grievance procedure will be governed by the NMFA and supplements.

## ARTICLE 53
### DURATION

This Agreement shall be in full force and effect from April 1, 1998 to and including
March 31, 2003 and shall continue from year to year thereafter unless written notice of
desire to cancel or terminate the Agreement is served by either party upon the other at
least sixty (60) days prior to date of expiration.

EMPLOYER:                                          UNION:
AIRBORNE FREIGHT CORPORATION                       IBT LOCAL 25

Representative                                     Representative
Date Signed 11/11/99                               Date Signed